NOT FOR PUBLICATION                                    (Document No. 30)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| KUMON NORTH AMERICA, INC., | : | |
| Plaintiff Counterclaim Defendant, | : | Civil No. 13-4809 (RBK/KMW) |
| v. | : | **OPINION** |
| DEMETRIO TIMBAN | : | |
| Defendant Counterclaimant. | : | |

**KUGLER**, United States District Judge:

This matter arises out of Kumon North America, Inc.'s ("Kumon's") claims against Demetrio Timban ("Mr. Timban") for allegedly continuing to operate his formerly franchised Kumon Math & Reading Center following Kumon's termination of his franchise agreement. Mr. Timban now asserts six counterclaims against Kumon: (1) Violation of the New Jersey Franchise Practices Act (the "NJFPA"), N.J. Stat. Ann. §§ 56:10-1 et seq.; (2) Breach of Contract; (3) Breach of the Implied Covenant of Good Faith and Fair Dealing; (4) Tortious Interference with Actual or Prospective Economic Advantage; (5) Unjust Enrichment; and (6) Violation of the New Jersey Consumer Fraud Act (the "NJCFA"), N.J. Stat. Ann. § 56:8-2. (Doc. No. 22 ("Countercl.").)  Currently before the Court is Kumon's Motion to Dismiss Mr. Timban's Counterclaims.  (Doc. No. 30.)  For the following reasons, Kumon's motion will be **GRANTED**.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

In 2006, Mr. Timban decided to change career paths and began researching different franchising options. (Countercl. ¶ 4.) Eventually, Mr. Timban entered into a franchise agreement with Kumon to operate a Kumon Math & Reading Center in Medford, New Jersey (the "Medford Center"). (Id.) From 2006 to 2009, Mr. Timban operated this center and enrollment "grew by leaps and bounds." (Id. ¶ 5.) The parties then entered into a revised franchise agreement on November 18, 2009, which extended the term of the agreement for five years, until November 18, 2014, and provided that the parties' contractual relationship would be governed by New Jersey law (the "Franchise Agreement"). (Id. ¶¶ 6-7, Ex. A.)

On April 9, 2012, Kumon sent Mr. Timban a notice of default stating that he had failed to pay royalties due to Kumon as required by the Franchise Agreement. (Id. ¶ 10.) Mr. Timban promptly paid the money owed. (Id.) On July 18, 2012, Mr. Timban failed to pay $8,590.68 in royalties because he did not have sufficient funds in his account. (Id. ¶ 11.) Several days later, Paul Johannson, Kumon's branch manager, requested a meeting with Mr. Timban to discuss his future as a Kumon franchisee. (Id. ¶ 12.) On August 1, 2012, Mr. Timban met with Mr. Johannson, as well as Kumon's legal counsel. (Id. ¶ 13.) During this meeting, Mr. Timban was advised that Kumon intended to terminate his franchise, but would delay the ultimate termination date until November 30, 2012, in order to afford Mr. Timban the opportunity to sell and transfer his franchise. (Id. ¶ 14.)

On August 3, 2012, Mr. Timban received a letter from Kumon reflecting the parties' August 1 discussion. This letter—the "Notice of Termination"—provided that the parties' agreement was to be terminated in accordance with Section 15.1(i) of the Franchise Agreement, which allowed Kumon to terminate with "no opportunity to cure" if Mr. Timban "repeat[ed] a

2

default listed in [Section 15.2 of the Franchise Agreement] after being provided an opportunity to cure the first time, whether or not [he] cured the first default." (Id. ¶ 16-17, Ex. B.) The failure to "make any payment of money that is due to [Kumon]" qualifies as a default under Section 15.2. (Compl. Ex. B.)

The Notice of Termination further stated:

- Kumon will delay the date for the termination of your Franchise Agreement until November 30, 2012.
- During this period of time, should you procure a potential purchaser for your Center and should such potential purchaser be acceptable to Kumon (in Kumon's discretion); and should such potential purchaser sign[] a Kumon Training Agreement and be admitted into Kumon Start-Up Training (SUT), Kumon will continue to extend the date for the termination of your Franchise Agreement until the potential purchaser is awarded a franchise to own and operate your Kumon Center.
- However should a potential purchaser not complete SUT or not be awarded a franchise to own and operate a Kumon Center for any reason whatsoever (in the discretion of Kumon), your Franchise Agreement will be terminated upon thirty (30) days' prior written notice to you.
- Should you fail to procure an acceptable potential purchaser for your Kumon Center no later than November 30, 2012, your Franchise Agreement will terminate on December 31, 2012. In such event, December 31, 2012 will be the final day your Kumon Center will be allowed to be open and the final day upon which you may offer instruction in The Kumon Method.
- With 10 days of today's date you pay to Kumon all past due royalties. You will continue to remain current in your royalty payments to Kumon during the term of this extension. Should you fail to become current with your royalty payments or should you in the future not pay royalties to Kumon when due, Kumon will terminate your Franchise Agreement, the terms of extension contained in this Notice notwithstanding.
- So long as your Franchise Agreement remains in effect, you will adhere to all requirements set forth in the Agreement, including your compliance with each aspect of The Kumon Method of Instruction.

(Id.) Mr. Timban began searching for a buyer for the Medford Center. (Id. ¶ 20.) On August 17, 2012, Mr. Timban paid Kumon $15,864.64 in past due royalties. (Id. ¶ 21.) Subsequently, Mr. Timban informed Kumon that he had identified an individual named Dr. Daniels who was interested in purchasing the Medford Center. (Id. ¶ 22.) On October 25, 2012, Mr. Timban and Dr. Daniels met and agreed to a deal subject to Kumon's approval; they then submitted a Notice

3

of Intent to Transfer to Kumon.[1]  (Id. ¶¶ 24-25.)  Per Kumon's direction, Mr. Timban bought approximately $3,500.00 worth of new furniture for the Medford Center in order to secure approval for the Medford Center's sale and transfer to Dr. Daniels.  (Id. ¶ 26.)  On November 27, 2012, a representative from Kumon called Mr. Timban and told him that Dr. Daniels was rejected as a franchisee candidate.  (Id. ¶ 27.)

In December 2012, Mr. Timban began discussing the sale of the Medford Center with two new potential buyers, Mr. and Mrs. Kraft (the "Krafts").  (Id. ¶ 29.)  As the Krafts were short on funds, Mr. Timban put them in touch with Dr. Daniels to see if the three of them would be willing to purchase the Medford Center together.  (Id.)  On December 12, 2012, Mr. Timban met with Mino Tanabe, Kumon's new regional director and Mr. Timban informed Mr. Tanabe that he had new potential buyers for the Medford Center.  (Id. ¶ 30.)  According to Mr. Timban, Mr. Tanabe told him that Kumon "wanted to work with [him]" to facilitate a smooth transition.  (Id.)  And, in the interim, Mr. Timban would continue to operate the Medford Center until the new owners completed their training, which would not be before November 2013.  (Id.)

On January 28, 2013, Mr. Timban received an email from Kumon stating that although he was afforded additional time to procure a purchaser for the Medford Center, as of that date, he had failed to identify a purchaser that was acceptable to Kumon.  (Id. ¶ 33, Ex. D.)  Accordingly, Kumon stated that the final day he could operate the Medford Center would be January 31, 2013.  (Id.)  As of that date, Mr. Timban's Franchise Agreement would terminate and he would no longer be authorized to offer instruction in the Kumon Method or engage in any activities related to Kumon.  (Id.)  In reply, Mr. Timban responded that he had secured two sets of potential

---

[1] "The notice set forth:  (1) the prospective transferee's name; (2) address; (3) statement of financial qualification; and (4) business experience for the previous five years."  (Countercl. ¶ 25.)

purchasers and that he understood that "one set of potential purchasers ha[d] already been approved and [they were] ready to move on that."  (Id. ¶ 36, Ex. E.)

Kumon responded to Mr. Timban's email later that day stating that no candidate presented to Kumon was acceptable, no representations had been made to the contrary, and Kumon personnel would be in touch to facilitate the closure of the Medford Center.  (Id. ¶ 36, Ex. F.)  However, Kumon sent another email later that day reversing course and extending the term of the Franchise Agreement until February 28, 2013, so that Kumon could evaluate the two parties identified by Mr. Timban as being amenable to his purchase price for the Medford Center.  (Id. ¶ 37, Ex. G.)  Kumon noted, however, that if it did not approve either or both of Mr. Timban's candidates by February 28, 2013, Mr. Timban's Franchise Agreement would terminate without further notice.  (Id.)

On February 4, 2013, Kumon emailed Mr. Timban reminding him that the company was expecting his purchase and sale agreement the following day so that its legal department would have ample time to review.  (Id. ¶ 38, Ex. H.)  Dr. Daniels and the Krafts submitted the requested documents to Kumon, who confirmed receipt on February 6, 2013; however, Kumon informed Mr. Timban that he would need to correct the paperwork and find out whether the Medford Center's landlord required a new lease or if there would be an assignment of the existing lease. (Id. ¶¶ 39-40.)  Mr. Timban made the requested change and he, along with Dr. Daniels and the Krafts, responded to Kumon's question.  (Id. ¶ 41.)  On February 26, 2013, Mr. Timban confirmed with his prospective purchasers that they had submitted their financial documents to Kumon.  (Id. ¶ 43.)

Mr. Timban did not hear back from Kumon until February 28, 2013, when he received a letter entitled "Final Notice of Termination of Franchise Agreement and Date for Closure of

5

Center" (the "Termination and Rejection Letter").  (Id. ¶ 44.)  In this letter, Kumon indicated that Mr. Timban,

> failed and refused to negotiate in good faith and to provide either of your candidates with critical information concerning the Medford [ ] Center.  As reported to us, neither of your candidates will proceed with negotiations due to your insistence on withholding critical information concerning the Medford [ ] Center.  Therefore, Kumon cannot approve either candidate.  There will be no further extension of your Franchise Agreement.  The opportunities Kumon afforded you to sell the Medford [ ] Center have proven been [sic] wasted.  The final day upon which your Franchise Agreement will terminate is April 30, 2013.

(Id. ¶ 44, Ex. J.)  Counsel retained by Mr. Timban wrote Kumon arguing that its actions in terminating Mr. Timban's franchise were improper.  (Id. ¶ 47.)  In response, Kumon stated:

> (1) Timban had been in breach of his Franchise Agreement more often than not, (2) each breach was well documented, (3) his Franchise Agreement was terminated due to his failure to pay royalties, (4) Kumon delayed the effective date of termination in order to allow Timban the opportunity to procure a purchaser for the Medford Center, and (5) as of February 28, 2013, each of Timban's prospective purchasers told Kumon that Timban was dragging his feet on providing them with financial information about the Medford Center, and thus neither was willing to move forward.

(Id. ¶ 48, Ex. L.)  It also noted that the

> vetting of the qualifications of a prospective Kumon franchisee consumes at least 30 days . . . instructor training consumes the better part of a year" and "[g]iven its history of dealing with Mr. Timban . . . Kumon simply cannot allow him to continue running the Medford Center for another year while his prospect (assuming the prospect is acceptable to Kumon) goes through training."

(Id.)  On or about April 12, 2013, Kumon sent notices to Kumon parents advising them that the Medford Center would be closed at the end of April 2013.  (Id. ¶ 51, Ex. M.)

## II.   LEGAL STANDARD ON A MOTION TO DISMISS

When deciding a motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court limits its review to the face of the counterclaim.  Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 835 (3d Cir. 2011).  The Court must accept as true all well-pleaded factual allegations and must construe them in the light most favorable to the non-

6

moving party.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).  In other words, a [counterclaim] is sufficient if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "The inquiry is not whether [a counterclaimant] will ultimately prevail in a trial on the merits, but whether [he or she] should be afforded an opportunity to offer evidence in support of [his or her] claims."  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002).  However, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.

To determine whether a complaint is plausible on its face, courts conduct a three-part analysis.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Id. (quoting Iqbal, 556 U.S. at 675).  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Id. at 131 (quoting Iqbal, 556 U.S. at 680).  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Id. (quoting Iqbal, 556 U.S. at 680).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible.  Id.

### III. DISCUSSION

#### A. Counterclaim I – Violation of the NJFPA

Enacted in 1971, the NJFPA was aimed at curbing the tendency of franchisors to profit

7

unduly from their superior economic and bargaining positions when negotiating agreements with potential franchisees. Goldwell of N.J., Inc. v. KPSS, Inc., 622 F. Supp. 2d 168, 184 (D.N.J. 2009) (citing Westfield Centre Serv., Inc. v. Cities Serv. Oil Co., 432 A.2d 48, 52-53 (N.J. 1981)); see also Goldsworthy v. Browndorf, No. L–2177–04, 2011 WL 3687401 at *3 (N.J. Super. Ct. App. Div. Aug. 24, 2011) (explaining that the NJPFA "reflects the legislative concern over longstanding abuses in the franchise relationship, caused by the power disparity between franchisors and franchisees") (citation and internal quotations omitted). To remedy this problem, the Act, among other things, creates "an exception to the general rule that two businesses are free to terminate their business relationship according to the terms of their contract." New Jersey American, Inc. v. Allied Corp., 875 F.2d 58, 61 (3d Cir. 1989).

Excepting two limited circumstances,[2] a franchisor may not terminate, cancel, or fail to renew a franchise subject to the NJFPA unless it provides advanced written notice of such action and it does so for "good cause." N.J. Stat. Ann. § 56:10-5. "Good cause" is defined under the NJFPA as "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." Red Roof Franchising, LLC v. Patel, 877 F. Supp. 2d 124, 138 (D.N.J. 2012) (citing N.J. Stat. Ann. § 56:10-5; General Motors v. New A.C. Chevrolet, Inc., 263 F.3d 296, 320 n.11 (3d Cir. 2001)). Although franchisees need not adhere absolutely to every nuanced term of an agreement, they must, at a minimum, "refrain from acting in direct defiance

---

[2] Franchisors may terminate a franchise without giving written notice in cases:

> (1) where the alleged grounds are voluntary abandonment by the franchisee of the franchise relationship in which event the aforementioned written notice may be given 15 days in advance of such termination, cancellation, or failure to renew; and
> (2) where the alleged grounds are the conviction of the franchisee in a court of competent jurisdiction of an indictable offense directly related to the business conducted pursuant to the franchise in which event the aforementioned termination, cancellation or failure to renew may be effective immediately upon the delivery and receipt of written notice of same at any time following the aforementioned conviction.

N.J. Stat. Ann. § 56:10-5.

of a term of the agreement," and they may not "deprive the injured party of the benefit that they justifiably expected under the contract" by breaching any material, i.e., essential, term. Id. (citation omitted); see also Maple Shade Motor Corp. v. Kia Motors, Inc., 260 F. App'x 517, 518 (3d Cir. 2008) (citing General Motors, 263 F.3d at 315).

As the purpose behind the NJFPA is to protect "franchisees who have conscientiously striven to carry out their obligations under the franchise agreement," it will not "prevent the severance of those who deliberately disregard [the] reasonable requirements contained in their contract with the franchise." Amerada Hess Corp. v. Quinn, 362 A.2d 1258, 1267 (N.J. Super. Ct. Law Div. 1976) (emphasis added); see also Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 495 A.2d 66, 72 (N.J. 1985) ("[The NJFPA] . . . does not compensate those franchisees who have lost their franchises as a result of their own neglect or misconduct."). For that reason, the NJFPA does not "protect a franchisee that cures one default, but continues other substantial violations of the franchise agreement." Goldsworthy, 2011 WL 3687401, at *6 (stating that "no franchisee may prosecute an NJFPA action if it continues to violate its franchise agreement"). Further, a franchisor has a defense to any action under the NJFPA if it is shown that the franchisee failed to substantially comply with the franchise agreement. See N.J. Stat. Ann. § 56:10-9. Illustratively, the failure by a franchisee to make timely royalty payments constitutes substantial non-compliance, and therefore, good cause for termination of a franchise agreement. See Jiffy Lube Intern., Inc. v. Weiss Bros., Inc., 834 F. Supp. 683, 689 (D.N.J. 1993); Red Roof, 877 F. Supp. 2d at 138 (noting that "being in default . . . constitute[s] failure to substantially comply").

In this case, the parties do not dispute that Mr. Timban made multiple late royalty payments. (Countercl. ¶¶ 10-11.) Mr. Timban argues that because he promptly cured his

9

defaults, he was in substantial compliance and thus did not materially breach the agreement. (Id. ¶ 47.) The Court disagrees. Timely royalty payments constitute precisely the benefit that Kumon justifiably expected to receive under the Franchise Agreement, and Mr. Timban's failure to make these required payments constituted a material breach.

Kumon complied with the terms of the Franchise Agreement and the NJFPA when it notified Mr. Timban of his default on April 9, 2012. After Mr. Timban again defaulted on his obligation to pay, Kumon had good cause to terminate the Franchise Agreement and thus Mr. Timban's NJFPA claim based on this allegation is without merit. (See Countercl. Ex. A §§ 15.1 and 15.2).

Mr. Timban also argues Kumon violated the NJFPA by failing to approve the transfer of his franchise.[3] As discussed, however, a franchisor has a defense to any action under the NJFPA if it is shown that the franchisee failed to substantially comply with the franchise agreement. See N.J. Stat. Ann. § 56:10-9. Once Mr. Timban failed to pay his royalty payments when due, and thus failed to substantially comply with the Franchise Agreement, Kumon was under no obligation to approve any transfer. Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 495 A.2d 66, 72 (N.J. 1985) (expressing approval for the rationale that once a franchisee

---

[3] The NJFPA provides:

> It shall be a violation of this act for any franchisee to transfer, assign or sell a franchise or interest therein to another person unless the franchisee shall first notify the franchisor of such intention by written notice setting forth in the notice of intent the prospective transferee's name, address, statement of financial qualification and business experience during the previous 5 years. The franchisor shall within 60 days after receipt of such notice either approve in writing to the franchisee such sale to proposed transferee or by written notice advise the franchisee of the unacceptability of the proposed transferee setting forth material reasons relating to the character, financial ability or business experience of the proposed transferee. If the franchisor does not reply within the specified 60 days, his approval is deemed granted. No such transfer, assignment or sale hereunder shall be valid unless the transferee agrees in writing to comply with all the requirements of the franchise then in effect.

N.J. Stat. Ann. § 56:10-6

commits a substantial breach of the franchise agreement, and thus termination is authorized, the objectionable franchisee has no right to continue operating the franchise or to transfer it for value and that this "unacceptable franchise owner" essentially "los[es] all rights to the franchise[,] [t]ermination [is] the remedy, and termination [is] to be imposed without any conditions attached").

Accordingly, Mr. Timban's NJFPA claim will be dismissed.

### B. Counterclaim II – Breach of Contract

In Counterclaim II, Mr. Timban alleges that Kumon breached its obligations under the Franchise Agreement by terminating him as a franchisee when he had not materially breached a term of the agreement and by failing to approve the transfer of his franchise. (Countercl. ¶ 68.) Mr. Timban further alleges that to the extent he did materially breach the Franchise Agreement, he promptly cured. (Id.)

"[T]o prove a claim for breach of contract, [Mr. Timban] must demonstrate that a valid contract existed and that the defendant failed to perform under the contract causing injury." Red Roof, 877 F. Supp. 2d at 131 (citing Murphy v. Implicito, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007)). There is no dispute that the parties had a valid franchise agreement; however, Mr. Timban has failed to allege that Kumon failed to perform under that agreement.

When Mr. Timban failed to remit timely royalty payments to Kumon pursuant to his obligations under the Franchise Agreement, he received written notice from Kumon on April 9, 2012, informing him of this default. (Countercl. ¶ 10.) In accordance with the terms of the Franchise Agreement, Mr. Timban was provided an opportunity to cure this default within thirty days, which he did. (Id.) On July 18, 2012, Mr. Timban missed another royalty payment and Kumon informed Mr. Timban that it intended to terminate the parties' relationship without

providing Mr. Timban with another opportunity to cure pursuant to Section 15.1 of the Franchise Agreement; Mr. Timban received written notice of this decision on August 3, 2012. (Countercl. Ex. B).

Thus, Kumon's termination of the Franchise Agreement does not constitute a failure to perform such that Kumon can be found liable for breach of contract.

Mr. Timban also alleges that Kumon breached the Franchise Agreement by failing to approve a franchise transfer. (Countercl. ¶ 68). Again, however, Kumon was not required to approve any transfer under the terms of the agreement. The Franchise Agreement specifically provides that a transfer will not occur in the absence of Kumon's prior written consent. (See Countercl. Ex. A § 18.2.) Furthermore, Mr. Timban was given additional time to procure transferees for Kumon's consideration, but Kumon specifically stated in the Notice of Termination that these prospective transferees needed to be acceptable to Kumon, sign a Kumon Training Agreement, and be admitted into Kumon Start-Up Training ("SUT"). If these conditions were not met, i.e., a potential purchaser did not complete SUT "or not be awarded a franchise to own and operate a Kumon Center for any reason whatsoever (in the discretion of Kumon)," Mr. Timban's Franchise Agreement would be terminated upon thirty (30) days' prior written notice. (Compl. Ex. B.) Thus, Kumon's failure to approve the transfer of Mr. Timban's franchise did not constitute a failure to perform. (See Countercl. Ex. A § 18.)

Mr. Timban's breach of contract claim will also be dismissed.

### C. Counterclaim III – Breach of the Implied Covenant of Good Faith and Fair Dealing

In Counterclaim III, Mr. Timban alleges that Kumon violated the implied covenant of good faith and fair dealing by "pretextually terminating" his franchise and by "failing to allow him to transfer his Center so that [Kumon] could profit by appropriating the franchise."

12

(Countercl. ¶ 74.) He further states that he "was not treated in [a] fair and nondiscriminatory manner" because although Kumon terminated his franchise, other Kumon franchisees' had their "transfers [ ] approved . . . under the same or similar circumstances [ ] and/or [these franchisees] continue[d] to operate despite the fact they [ ] repeatedly [fell] behind in promptly making their royalty payments." (Id. ¶ 75.)

"New Jersey courts have long recognized that there is an implied covenant of good faith and fair dealing in every contract." Barows v. Chase Manhattan Mortg. Corp., 465 F. Supp. 2d 347, 365 (D.N.J. 2006) (citing Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997). "Such duty is grounded on the fundamental principle that in every contract there is an implied covenant that neither party shall commit any act which shall destroy or injure the rights of the other party to enjoy the fruits of the contract. However, this implied duty does not alter the terms of a written agreement. Id. (citing Rudbart v. N.J. Dist. Water Supply Comm'n, 605 A.2d 681, 692 (N.J. 1992) (internal citation omitted)); see also Luso Fuel Inc. v. BP Prods. N. Am., Inc., No. 08-3947, 2009 WL 1873583, at *5 (D.N.J. June 29, 2009) ("[n]onetheless, the implied duty of good faith and fair dealing "does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement").

Causes of action based on a violation of the covenant of good faith and fair dealing arise in three situations:

> (1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance.

Barows, 465 F. Supp. 2d at 365 (citing Seidenberg v. Summit Bank, 791 A.2d 1068, 1077 (N.J.

2002)).  None are present here.

     First, Mr. Timban alleges that Kumon "pretextually terminated" his franchise; however, he also sets forth factual allegations that demonstrate that he failed to substantially comply with the Franchise Agreement, and thus Kumon was within its rights in terminating the parties' relationship.  Second, Mr. Timban alleges that Kumon treated him unfairly by refusing to allow him to transfer the Medford Center.  However, his conclusory allegations as to Kumon's treatment of "other franchisees" are insufficient to "nudge [his] claim[] across the line from conceivable to plausible," especially when Kumon retained the ultimate approval of any prospective transferee and required any prospective transferee to fulfill several conditions precedent before a transfer would occur.  <u>Twombly</u>, 550 U.S. at 570.  Third, as discussed above, the Franchise Agreement provided that Kumon had the ultimate say as to whether it would approve prospective purchasers for the Medford Center, and the Notice of Termination specifically stated that any prospective purchasers were required to sign a Kumon Training Agreement and be admitted into SUT.  In the event that neither of these conditions were fulfilled, the Franchise Agreement was to terminate.  Accordingly, because these conditions were not fulfilled, and Mr. Timban does not allege that they were, it cannot be that Kumon engaged in an unfair exercise of discretion regarding its contract performance in declining to approve the Medford Center's transfer to Mr. Timban's proposed buyers.

     To hold that Mr. Timban sufficiently alleged a claim against Kumon based on the above-discussed conduct would necessarily require the Court to rewrite the terms of the parties' agreement.  Such an action would be improper, <u>see</u> <u>Luso Fuel</u>, 2009 WL 1873583, at *5; thus, this claim will be dismissed.

### D. Counterclaim IV – Tortious Interference with Actual or Prospective Economic Advantage

In Counterclaim IV, Mr. Timban alleges that he had "valuable contractual relationships" with "the buyers of his Center and/or students with whom his Center offered services and products" and that Kumon "maliciously interfered" with these "contractual relationships." (Countercl. ¶ 80.) He also alleges that he had "prospective business relations with parents of school children in the Medford vicinity, with neighboring school districts, and with parents of students who had previously been enrolled in his Center, who might return or who might have other, younger children who would enroll in the future." (Id. ¶ 79.)

In New Jersey, to establish a claim for tortious interference with a prospective economic advantage or existing contractual relations, a plaintiff must allege: (1) the existence of a reasonable expectation of economic advantage, (2) an intentional and malicious interference with that expectation by the defendant, (3) a causal connection between the interference and the loss of the prospective gain, and (4) damage. Espinosa v. Cnty. of Union, 212 F. App'x 146, 157 (3d Cir. 2007) (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 37-38 (N.J. 1989)); see also Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996).[4] "Malicious interference" has been interpreted to mean that the offending party's actions "were malicious in the sense that the harm was inflicted intentionally and without justification or excuse." Mandel

---

[4] At times, the Third Circuit has included a fifth element. See F.D.I.C. v. Bathgate, 27 F.3d 850, 871-872 (3d Cir. 1994) ("Under New Jersey law the five elements of a claim of tortious interference with a prospective or existing economic relationship are: (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; *(2) the defendant's knowledge of that expectancy*; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference."). However, New Jersey courts have observed that this is a distinction without a difference, and federal district courts have agreed. See Singer v. Beach Trading Co., Inc., 876 A.2d 885, 895 (N.J. Super. Ct. App. Div. 2005) (setting forth identical elements for "[a] claim for tortious interference with a contract and/or prospective business relationship requires a plaintiff to prove" the same four elements); see also Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 256 F. Supp. 2d 249, 288 (D.N.J. 2003) ("The requirements for each claim are identical except that the tortious interference with contractual relations claims requires proof of an existing contract"); Solutions Partners, Inc. v. Thomas, No. 09-4778, 2010 WL 2036139, *2 (D.N.J. May 21, 2010).

v. UBS/PaineWebber, Inc., 860 A.2d 945, 959 (N.J. Super. Ct. App. Div. 2004).

Here, Mr. Timban's conclusory assertion that Kumon "maliciously interfered" with his alleged contractual relationships—he does not actually allege malicious interference with his prospective economic advantage—fails to satisfy his pleading burden under Iqbal and Twombly. Indeed, the facts alleged and documents attached to Mr. Timban's Counterclaim show that Kumon's termination of his franchise was justified due to Mr. Timban's failure to pay royalties when due, and that Kumon was justified in declining to approve a transfer to Mr. Timban's proposed purchasers when the requirements set forth in the Notice of Termination related to a prospective transfer had not been met. Because Mr. Timban seeks redress for conduct that was in line with the express terms of the Franchise Agreement and the Notice of Termination, he cannot sustain a claim for tortious interference and thus Kumon's motion to dismiss will be granted on this ground as well. See Solutions Partners, Inc. v. Thomas, No. 09-4778, 2010 WL 2036139, at *3 (D.N.J. May 21, 2010) (dismissing tortious interference claim where allegations failed to set forth a claim that party's actions were "intentional[] and without justification").

### E. Counterclaim V – Unjust Enrichment

In Counterclaim V, Timban alleges that Kumon "received benefits from [Mr.] Timban and the retention of those benefits would be inequitable." (Countercl. ¶84.) Specifically, Mr. Timban alleges that Kumon's termination "will result in it obtaining customers from [the] [Medford] Center and the profits associated therewith." (Id.) Kumon argues that the existence of the Franchise Agreement bars Mr. Timban's claim as a matter of law. The Court agrees.

Unjust enrichment is an equitable remedy resorted to only when there is no express contract providing for remuneration; accordingly, a party may recover on one theory, but not both. Caputo v. Nice-Pak Prods., Inc., 693 A.2d 494, 498 (N.J. Super. Ct. App. Div. 1997)

(citing Van Orman v. Am. Ins. Co., 680 F.2d 301, 311 (3rd Cir. 1982)).  The existence of an express contract, however, does not preclude the existence of an implied contract if the implied contract is distinct.  Baer v. Chase, 392 F.3d 609, 617 (3d Cir. 2004).

Here, Mr. Timban challenges Kumon's actions within the terms of the Franchise Agreement; specifically, Kumon's right to terminate his franchise and its right to reject any unqualified prospective transferee.  Because an express contract governs the conduct at issue here, this claim also fails.  See Luso Fuel, 2009 WL 1873583 at *7 ("The theories of express contract and implied-in-fact contract are mutually exclusive, so that an implied contract may not exist where an express contract covers the same subject matter.").

### F. Counterclaim VI – Violation of the NJCFA

In Counterclaim VI, Mr. Timban alleges that Kumon's "treatment of him, including its use of false pretenses to terminate his franchise, constitute a violation of the NJCFA." (Countercl. ¶ 87.)

The NJCFA imposes liability on any person who uses "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission." N.J. Stat. Ann. § 56:8-2.  However, the Third Circuit has held that the NJCFA does not apply to franchises.  J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1273 (3d Cir. 1994) ("We conclude that even where franchises or distributorships are available to the public at large in the same sense as are trucks, boat or computer peripherals, they are not covered by the Consumer Fraud Act because they are businesses, not consumer goods or services.")

Although the Court recognizes that the New Jersey Superior Court, Appellate Division,

has criticized the Third Circuit's holding, see Kavky v. Herbalife Int'l of Am., 820 A.2d 677, 679 (N.J. Super Ct. App. Div. 2003), the majority of courts in this district have followed the Third Circuit's interpretation of the NJCFA, and this Court will do the same.  See Wingate Inns Int'l, Inc. v. Swindall, No. 12-248, 2012 WL 5252247, at *4 (D.N.J. Oct.23, 2012) (listing recent district court decisions following the Third Circuit precedent).  Accordingly, Mr. Timban's NJCFA claim fails as a matter of law.

### G.  Leave to Amend

"When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

For the reasons expressed above, the Court believes that amendment would be futile.  Accordingly, the Court will dismiss Mr. Timban's claims with prejudice.

## IV.  CONCLUSION

For the reasons stated, Mr. Timban's counterclaims will be dismissed with prejudice.  An appropriate order will issue today.


Dated:  6/23/2014                                                                s/ Robert B. Kugler
                                                                                                 ROBERT B. KUGLER
                                                                                                 United States District Judge